UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:14-cv-290-FDW

| | |
|---|---|
| EDDIE ELLENBURG,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>HENDERSON COUNTY JAIL, et al.,  )<br>)<br>Defendants.  )<br>) | ORDER |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendant Sean Brinson, (Doc. No. 27), on a Motion for Summary Judgment by Plaintiff Eddie Ellenburg, (Doc. No. 29), and on a Motion to Appoint Counsel by Plaintiff, (Doc. No. 31).

**I.     BACKGROUND**

A.     Procedural Background

Pro se Plaintiff Eddie Ellenburg, a North Carolina state court inmate currently incarcerated at Pasquotank Institution in Elizabeth City, North Carolina, filed this action on November 4, 2015, pursuant to 42 U.S.C. § 1983, alleging claims of excessive force, failure to protect, and deliberate indifference in violation of the Eighth Amendment by Henderson County Jail, Henderson County District Attorney Greg Newman, Henderson County Sheriff Charles McDonald, and Henderson County Sheriff's Office employee Sean Brinson at the Henderson County Detention Center ("the jail") on October 16, 2014.[1]  (Doc. No. 1).  On May 6, 2015, after

---

[1] As the Court discusses, infra, Plaintiff's sole remaining excessive force claim is appropriately analyzed under the Fourteenth Amendment's due process clause, rather than under the Eighth

1

initial review, this Court held that Plaintiff stated a claim against Brinson for excessive force, but the Court dismissed all of Plaintiff's other claims against all remaining Defendants. (Doc. No. 10). On February 8, 2016, Defendant Brinson filed the pending summary judgment motion. (Doc. No. 27). On February 18, 2016, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 28). On February 19, 2016, Plaintiff filed his own summary judgment motion. (Doc. No. 29). Finally, on March 4, 2016, Plaintiff filed the pending motion to appoint counsel. (Doc. No. 31).

  B. <u>Factual Background</u>

  1. <u>The Alleged Excessive Force Incident and the Summary Judgment Evidence</u>

  a. <u>Plaintiff's Allegations</u>

According to Plaintiff's allegations against the sole remaining Defendant in this action, Sean Brinson, Plaintiff alleges in the Complaint that on October 16, 2014, officers at the jail opened his cell door along with another inmate's cell. Plaintiff alleges that the other inmate came directly into his cell, jumped on him while in bed, and proceeded to punch him in the head and neck area. Plaintiff alleges that Defendant Brinson entered Plaintiff's cell and tazed him while he was still in his bed, injuring Plaintiff.[2]

  b. <u>Defendant's Summary Judgment Materials</u>

In support of the summary judgment motion, Defendant has submitted excerpts from

---

Amendment, because Plaintiff was a pre-trial detainee when the alleged excessive force occurred.

[2] Aside from unsworn allegations and statements, Plaintiff has presented no other evidence on summary judgment to support his claim against Defendant Brinson. <u>See</u> (Doc. Nos. 29; 32).

2

Plaintiff's deposition, as well as the Declaration of Defendant Brinson. See (Doc. No. 27-3: Eddie Ellenburg Dep.; Doc. No. 27-4: Brinson Decl.). Defendant's evidence on summary judgment shows that Plaintiff was incarcerated in the Henderson County Detention Center ("the jail") on August 30, 2014, after being charged with first-degree kidnapping, armed robbery, and conspiracy. (Doc. No. 27-3 at 19:2-4; 27:18-21: Eddie Ellenburg Dep.). Due to the nature of these charges, Plaintiff was placed in the special housing unit. (Id. at 31:12-18). In the special housing unit, inmates are let out for one hour a day and have no contact with other inmates, except a roommate. (Id. at 35:4-8; 36:1-5). Brinson was a deputy sheriff in the detention division, assigned to supervise inmates at the jail. (Doc. No. 27-4 at ¶ 3).

Inmate Michael Hoots was also incarcerated in special housing. (Doc. No. 27-3 at 40:13-16). Both Hoots and Plaintiff were housed on the second floor of the special housing unit. (Doc. No. 27-4 at ¶ 6). Hoots and Plaintiff verbally argued on October 15, 2014, over Plaintiff's prior relationship with Hoots' girlfriend. (Doc. No. 27-3 at 40:17-25; 41:1-2; 42:11-13). Brinson asked Plaintiff about the argument after it happened. Plaintiff told Brinson, "Everything's okay. We talked it out. We're good now." (Id. at 41:3-5). Plaintiff told Brinson that "everything was good because I thought everything was okay." (Id. at 42:9-10). The next morning, on October 16, 2014, Brinson was serving breakfast to inmates in the special housing unit. (Doc. No. 27-4 at ¶ 5). Officer Scott Justus was also in the special housing unit. (Id. at ¶ 7). Brinson first fed the inmates on the first floor and, after the inmates received their trays, closed their cells. (Id. at ¶¶ 5-6). Brinson then opened the second floor cells to let the second floor inmates get their food trays. (Id. at ¶ 6). After Brinson opened these second floor cells, he observed an inmate run into another inmate's cell. (Id.). Brinson later determined that it was Hoots running into Plaintiff's cell. (Id.).

3

According to Plaintiff, his cell door opened, and he woke up. (Doc. No. 27-3 at 45:18-19). Plaintiff began to put his shirt on over his head while on his bed, and then heard someone run into his cell. (Id. at 45:1-11). While Plaintiff was putting his shirt on, Hoots jumped on Plaintiff and began punching him. (Id. at 46:2-6). Hoots hit Plaintiff "probably a dozen" times in the head and face. (Id. at 46:22-25; 50:7-11). According to Plaintiff, he "was screaming for help . . . like a girl. You know, 'Man, get him off of me. Get him off of me.' I couldn't even fight back, I couldn't defend myself. . . . I mean, there was no way for me to defend myself." (Id. at 55:9-13). Plaintiff couldn't defend himself because he was half asleep, his shirt was still over his head, and Hoots jumped on him from behind. (Id. at 46:2-21).

Plaintiff tried to get out from under Hoots to defend himself. (Id. at 46:4-5). Plaintiff then "grab[bed] [Hoots] . . . and I was trying to cover up my face, trying to grab him and get in close to him so he'd quit hitting me . . . just hold on long enough for an officer to come in there and break it up and get him off of me." (Id. at 47:24-25; 48:1-3). Brinson ran upstairs after hearing scuffling sounds coming from Plaintiff's cell. (Doc. No. 27-4 at ¶ 7). Officer Justus remained on the first floor. (Id. at ¶ 9). Brinson went to the entrance of Plaintiff's cell, and observed Plaintiff and Hoots entangled with one another. (Id. at ¶ 10). Plaintiff confirmed that he was "rolling around" and trying to escape during the fight: "he was on top of me hitting me, and I'm trying to grab him and roll over, so I could get my hands underneath, like, I can get up, and I guess that's how I got hit." (Doc. No. 27-3 at 51:4-7; 102:6-17). When Brinson got to Plaintiff's cell, Hoots was still punching Plaintiff, and Plaintiff was still screaming for help. (Id. at 55:25; 56:1-7). Brinson yelled "stop fighting" to Hoots and Plaintiff. (Doc. No. 27-4 at ¶ 8). Plaintiff stated in his deposition that "[i]f [Brinson] did [say stop fighting], I couldn't hear it." (Doc. No. 27-3 at 58:16-17). Neither inmate complied with Brinson's order. (Doc. No. 27-4 at ¶

4

8).

From Brinson's perspective, both Hoots and Plaintiff posed an immediate threat to one another's safety. (Id. at ¶ 9). Both also appeared to be reasonably capable of injuring Brinson if he attempted to physically intervene in the fight. (Id.). To break up the fight and prevent injury to either inmate, Brinson discharged his taser from eight feet away. (Id. at ¶ 10). Officer Justus was still downstairs at this point. (Id. at ¶ 9). The taser prongs hit Plaintiff above his right knee and right hip. (Id. at ¶ 10). Plaintiff explained why he got tased in that area: "I knew I was—I had to get my foot up under me, so I roll over, and I mean, his—he's hitting me and everything, so I guess when I go to push up, that exposed this side of me. I didn't have no shirt on. That's why I got hit in the side. That's where I got hit." (Doc. No. 27-3 at 51:21-25; 52:1).

When the taser hit Plaintiff, he went to the floor and Hoots stopped hitting him. (Id. at 48:4-12). According to Plaintiff, the fight lasted about fifteen seconds. (Id. at 49:12-17). Brinson ordered Hoots to lie on the ground, and he complied. (Doc. No. 27-4 at ¶ 10). Officer Justus then entered the cell and handcuffed Hoots and Plaintiff. (Id. at ¶ 11). Hoots was charged with assault as a result of the fight. (Doc. No. 27-3 at 47:5-6). After the incident, Hoots and Plaintiff were placed in separate housing units. (Doc. No. 27-4 at ¶ 11). According to Defendant Brinson's declaration, a nurse examined Plaintiff after the incident, and he was released into regular custody.[3] (Id. at ¶ 12).

**II.   STANDARD OF REVIEW**

---

[3] Defendant states in his brief in support of the summary judgment motion that Plaintiff denied in his deposition that a nurse examined him after the incident. See (Doc. No. 27-3 at 79:6-14). Furthermore, in his own summary judgment briefs, Plaintiff states that a nurse did not treat him after the incident. See (Doc. No. 29 at 3; Doc. No. 32 at 5). Whether Plaintiff was seen by medical after the incident, however, is not relevant to Plaintiff's sole remaining claim against Defendant Brinson for excessive force.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate the existence of specific, material facts giving rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

### III. DISCUSSION

Because Plaintiff was a pre-trial detainee, his excessive force claim is analyzed under the Fourteenth Amendment. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). To prevail on his excessive force claim, Plaintiff must establish that the force applied by Brinson was objectively unreasonable. Id. In Kingsley, the Supreme Court set forth several factors in assessing whether an officer's use of force was reasonable:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (citing Graham v. Connor, 490 U.S. 386, 395, 396 (1989)). In assessing whether Defendant used excessive force, this Court must make that determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Additionally, the Court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979)).

In support of the summary judgment motion, Defendant Brinson argues that he is entitled to summary judgment because the force used by him was an attempt to maintain order and discipline in the jail, and was objectively reasonable. Defendant Brinson argues, alternatively, that he is entitled to qualified immunity because he did not violate Plaintiff's clearly established rights. The Court agrees that Defendant Brinson did not violate Plaintiff's constitutional rights because the force used was objectively reasonable. First, the relationship between the need for force and the amount of force used to restore discipline was closely matched. The force began after Plaintiff and Hoots refused an order to stop fighting, and the force ended when the fighting stopped. It is undisputed that Defendant Brinson discharged his taser only one time. (Doc. No. 27-4 at ¶ 10). No force was used after Hoots and Plaintiff stopped fighting, and no other means of force such as pepper spray, batons, or fists were used.

Second, while Plaintiff suffered injuries from the assault by Hoots, Plaintiff only suffered minimal injuries from the use of the taser. After being assaulted by Hoots, Plaintiff had two black eyes and a crooked nose. (Doc. No. 27-3 at 46:25; 47:1-2). Plaintiff testified in his deposition that his injuries from the taser "wasn't nothing bad." (Id. at 61:19). He received a cut where the taser prongs went into his side, but the cut "healed up in a couple of weeks," and he received no adverse effects from that injury. (Id. at 62:17-20; 63:14-16).

Third, Defendant Brinson attempted to prevent the use of force by yelling at the inmates to stop fighting, but they ignored his command. (Doc. No. 27-4 at ¶ 8). Fearing that he would be injured if he tried to intervene, Brinson deployed his taser only one time. (Id. at ¶¶ 9-10). As noted, when the fighting stopped, no additional force was employed. Fourth, Plaintiff's and Hoots' fighting clearly presented a serious security problem. The Supreme Court has repeatedly observed that prisons present an "ever-present potential for violent confrontation." Whitley v.

Albers, 475 U.S. 312, 321 (1986) (quoting Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977)). Consequently, the Supreme Court has concluded that security is the overriding penological interest at stake in any jail or prison. "[T]he core functions of prison administration [are] maintaining safety and internal security." Turner v. Safley, 482 U.S. 78, 92 (1987). The lower courts have agreed that inmate fights pose serious security problems. See Rodriguez v. Ghoslaw, No. 98 Civ. 4658(GEL), 2001 WL 755398, at *5 (S.D.N.Y. July 5, 2001) (unpublished) ("[d]eliberately allowing inmates to engage in violence to settle their own scores, in contrast, would surely violate fundamental standards of human dignity embodied in the Eighth Amendment."); see also McRae v. Johnson, 261 Fed. Appx. 554, 558 (4th Cir. 2008) (unpublished) (finding that "in the prison setting, suppression of contraband . . . [and] maintaining the health and safety of inmates and staff . . . constitute compelling governmental interests"); Jefferson v Strain, Civ. No. 13-0328, 2013 WL 4776499, at *10 (E.D. La. Sept. 4, 2013) (unpublished) (rejecting the plaintiff's excessive force claim where officers used mace and a taser to stop the plaintiff's fight with another inmate, holding that "the officers used the force to restore order and discipline"); Wallace v. Moberg, No. CV 07-6-VAP(AGR), 2009 WL 91079, at *7 (C.D. Cal. Jan. 10, 2009) (unpublished) (use of pepper spray to break up fight between two inmates did not constitute excessive force under the Eighth Amendment because defendant correctional officers reasonably perceived altercation as a threat to the safety and security of the inmates and themselves). In fact, Brinson's perception of this security problem was also aggravated by his knowledge that Hoots and Plaintiff had argued just one day earlier.

Last, from Brinson's perspective, the threat to Plaintiff, Hoots, and himself was serious. When Brinson arrived at Plaintiff's cell, Plaintiff was screaming for help, and Hoots was assaulting him. Brinson states that he believed that Hoots and Plaintiff posed an immediate

9

threat to one another's safety, as well as his own if he attempted to physically intervene by himself. Plaintiff candidly admitted in his deposition that Brinson's perception was correct: "Q: And I guess my question is—if—let's say Brinson never showed up or Justice [sic] never—nobody ever showed up, do you think Hoots would have continued trying to punch you? A: Man, yeah. Yeah, I know that." (Doc. No. 27-3 at 116: 11-16). While, in hindsight, Plaintiff was the "victim" of Hoots' assault, Brinson observed them in a mass together, and he didn't have the luxury of waiting until he got the opportunity to get a clear shot at tasing Hoots. As the Supreme Court has stated, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). In sum, the Court finds that Brinson's conduct was reasonable in light of the circumstances.[4] Thus, Plaintiff has not shown that Defendant Brinson violated his constitutional rights by use of excessive force.

The Court further finds that, even if Plaintiff had demonstrated that his constitutional rights were violated, Brinson would be protected by qualified immunity under the facts of this case. Qualified immunity shields "government officials performing discretionary functions . . .

---

[4] The Court notes that Brinson's use of force is also reasonable in light of the Fourth Circuit's recent decision discussing the use of tasers in Estate of Armstrong v. Village of Pinehurst, 810 F.3d 892 (4th Cir. 2016). In an opinion dated January 11, 2016, the Fourth Circuit stated "that a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force." Id. at 905. The Fourth Circuit further held that "[w]here, during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed, those officers use unreasonably excessive force." The Court noted in the opinion that, "while qualified immunity shields the officers in this case from liability, law enforcement officers should now be on notice that such taser use violates the Fourth Amendment." (Id. at 910).

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Consequently, Brinson is entitled to qualified immunity if either his conduct did not violate any constitutional rights, or the right was not clearly established. Pearson v. Callahan, 555 U.S. 223, 232 (2009). The qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (citing Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)). Here, even assuming that Brinson's use of force was not objectively reasonable under Kingsley, the right not to be tased once by an officer trying to break up an inmate fight was certainly not clearly established. Indeed, Plaintiff's own deposition testimony supports this conclusion. When asked what Brinson could have done differently instead of using his taser, Plaintiff replied "[t]hat man discharged his thing prematurely. He didn't take time to assess the situation." (Doc. No. 27-3 at 53:18-19). According to Plaintiff, Brinson should have "tased the person who was actually doing the swinging," or "physically broke it up," or Brinson and Officer Justus "could have pulled the guy off of me." (Id. at 57:4-5; 58:18-19; 59:1-2; 10-11). Plaintiff's responses demonstrate why Brinson is entitled to qualified immunity. Since it is well established that an officer may use minimal force to maintain discipline, Brinson did not transgress a bright line in tasing Plaintiff to break up the fight between him and Hoots. Indeed, Brinson had the following options when he went to Plaintiff's cell: (1) ignore the fight and let it continue; (2) wait until Officer Justus arrived and then attempt to break up the fight using their hands; (3) try and break up the fight himself with his hands; or (4) use a taser to break up the fight. Any of these

11

alternatives presented their own problems. For instance, had Brinson ignored the fight or waited until Justus arrived, he would be subject to suit under 42 U.S.C. § 1983 on a failure to protect theory.[5] Brown v. Harris, 240 F.3d 383, 388-89 (4th Cir. 2001). See also Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (finding that "a corrections officer's failure to intervene in a beating can be the basis of liability . . . if the corrections officer had a reasonable opportunity to intervene and simply refused to do so"); Robinson v. Prunty, 249 F.3d 862, 867 (9th Cir. 2001) (holding no qualified immunity where the guards failed to intervene while one inmate attacked another).

Courts have recognized that Brinson's third option—trying to break up a fight between two inmates by himself—also presents risks to both the officer and the inmates. As the Seventh Circuit has stated, "[a] prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." Guzman v. Sheahan, 495 F.3d 852, 858 (7th Cir. 2007). See also Williams v. Willits, 853 F.2d 586, 591 (8th Cir. 1988) (recognizing that guards who attempted to intervene in a fight involving inmates but then stopped due to being outnumbered "made the perfectly reasonable decision that further intervention would threaten the health and safety of all concerned" because "the guards were suddenly outnumbered by inmates which event made breaking up the fight physically impossible").

Certainly, any reasonable officer when confronted with this situation would have chosen the same path as Brinson. That is the very essence of qualified immunity—officers cannot be

---

[5] Moreover, as Defendant notes, at the very least, had Brinson failed to intervene, he might also be subject to state tort claims of negligence or injury to a prisoner claim. See e.g., N.C. GEN. STAT. § 162-55 (a "keeper of the jail" who does or causes to be done, "any wrong or injury" to prisoners in his custody, shall pay treble damages and be guilty of a class 1 misdemeanor).

12

held liable for making bad guesses. In the situation that Brinson confronted on October 16, 2014, the option that he took was certainly reasonable under the circumstances. In fact, Plaintiff recognizes that if Brinson didn't tase him, Hoots would have continued to punch him. (Doc. No. 27-3 at 116:11-16; 127:9-11). In a case dealing with the use of force on prisoners, the Fourth Circuit recognized that "[i]n dealing with such agitated detainees prison officials must not be forced to walk a tightrope and face the prospect of a lawsuit no matter which way they turn." Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999). In Grayson, a plaintiff was first pepper-sprayed after he tried to get out of the cell. Id. at 694. He was then moved to another cell and, during that move, was pinned down and punched by an extraction team. Id. The Fourth Circuit upheld the grant of summary judgment because "officers obviously felt the need to subdue [plaintiff], either to calm the general environment or to prevent [plaintiff] from hurting himself. If we failed to accord due deference to the officers' efforts, we would give encouragement to insubordination in an environment which is already volatile enough." Id. at 697. As Defendant notes, this case is similar to the situation encountered by the officers in Grayson. The force was used solely to ensure compliance with Brinson's commands, and did not violate Plaintiff's rights. Under the facts of this case, it cannot be said that "every reasonable official" would have understood that tasing Plaintiff to prevent injury to Hoots and Plaintiff, violated Plaintiff's rights. Ashcroft v. al-Kidd, 563 U.S. 731 (2011).

In his response brief, Plaintiff admits that the following facts set forth in Defendant's motion for summary judgment are accurate: (1) that he was assaulted by Hoots while in his room on the bed, (Doc. No. 32 at 5); (2) that he was "rolling around, trying to escape, to avoid being hit [by Hoots] as much as possible, (id. at 3); (3) when Brinson entered the cell, Hoots was punching Plaintiff, (id. at 4); and (4) when Brinson entered the cell, Plaintiff was "screaming for

13

help," (id. at 4). As a result of these concessions, Plaintiff does not contend that Brinson's use of the taser was unreasonable—he argues only that Brinson should have tased Hoots, not Plaintiff. In fact, Plaintiff states that "[i]f the defendant would've done his job and stepped up close enough to where when he discharged his taser he would've hit the right person." (Id. at 4). However, even assuming Plaintiff was not the aggressor and was, in fact, not the "right person," Brinson's tasing of Plaintiff still does not render the tasing unreasonable under the circumstances of this case. See Milstead v. Kibler, 243 F.3d 157, 164 (4th Cir. 2001) (holding that the mistaken use of force on the victim rather than the suspect was reasonable under the circumstances, where the officer had to determine in seconds whether the person approaching him was the suspect or the victim). Here, when Brinson approached Hoots and Plaintiff, he observed them entangled with one another, fighting. Brinson did not have the time or luxury of investigating who started the fight, or who was yelling "help me," before taking action.

Additionally, Plaintiff's assertion that "[t]here's no way the defendant took the time to discern the situation and make the right decision," (Doc. No. 32 at 11), demonstrates why Brinson is entitled to qualified immunity. The reasonableness of a use of force is judged on the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396. As Plaintiff admits, Brinson was confronted with a volatile situation where Plaintiff and Hoots were fighting, Plaintiff was yelling for help, and the fighting did not stop when Brinson ordered them to stop. In sum, for all these reasons, even if the Court were to find that Defendant Brinson violated Plaintiff's constitutional rights, Defendant Brinson would be entitled to qualified immunity.

Finally, the Court finds that, although Plaintiff has no failure to protect claim, (Doc. No. 10), he continues to assert, in his response, the same argument he made in his own summary

14

judgment motion—that his injuries occurred because Brinson "[opened the] doors against policy" and "created a dangerous situation." (Doc. No. 32 at 6; 7). The United States Supreme Court has rejected the contention, however, that a constitutional violation can be established based on an officer's behavior <u>before</u> the use of force. <u>See</u> <u>City & Cnty. of San Francisco v. Sheehan</u>, 135 S. Ct. 1765, 1777 (2015) (holding that, even if officers misjudged the situation, the plaintiff could not "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided"). Thus, to the extent that Plaintiff seeks to impose liability on Defendant Brinson based on his theory that Defendant Brinson somehow created a dangerous situation, Defendant is entitled to summary judgment as to this theory of liability.

In sum, the Court finds that Plaintiff has not raised a genuine dispute as to whether Defendant Brinson—the sole remaining Defendant in this action—used excessive force against Plaintiff. Thus, Defendant is entitled to summary judgment on Plaintiff's excessive force claim. The Court further finds that, even if the Court were to hold that Defendant used excessive force, he would nevertheless be entitled to qualified immunity.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Brinson's Motion for Summary Judgment, (Doc. No. 27), is **GRANTED,** and this action is dismissed with prejudice. To this extent, Plaintiff's own Motion for Summary Judgment, (Doc. No. 29), is **DENIED**.

2. Plaintiff's Motion to Appoint Counsel, (Doc. No. 31), is **DENIED** as moot.

3. The Clerk is directed to terminate this action.

Frank D. Whitney
Chief United States District Judge